IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

```
------------------------------------------------------   :
UNITED STATES OF AMERICA,              : CASE NO.  4:07 CR 00603
                                       :
                        Plaintiff,     :
                                       :
            -vs-                       : MEMORANDUM OF OPINION AND
                                       : ORDER DENYING DEFENDANT'S
                                       : MOTION TO SUPPRESS
ISMAEL CAMACHO, III,                   :
                                       :
                        Defendant.     :
------------------------------------------------------   :
```

UNITED STATES DISTRICT JUDGE LESLEY WELLS

Before the Court is defendant Ismael Camacho, III's ("Mr. Camacho") motion to suppress evidence seized during a search of his person and from the automobiles in which he was a passenger on 8 March 2006 and 5 May 2007.  (Doc. 52).  Mr. Camacho also moves to suppress any statements he may have made during these two searches.[1]

---

[1] Mr. Camacho merely asserts that his statements should be suppressed as a "result of the two illegal searches."  Because Mr. Camacho makes no further assertion, let alone any showing, regarding the reasons to suppress his "statements" and the government represents the passengers of the vehicles were properly Mirandized, the Court will deny Mr. Camacho's request to suppress any statements he may have made, where the Court concludes that the searches were not illegal.

The government submits a responsive brief in opposition (Doc. 59) to which Mr. Camacho has replied (Doc. 74).

Pursuant to the reasoning set forth below, this Court adduces, as a matter of law that: Mr. Camacho lacks standing to challenge the search of the vehicles in which he was a mere passenger, pursuant to United States v. Carter, 14 F.3d 1150 (6th Cir. 1994); the agents and officers involved in both traffic stops possessed at least a reasonable suspicion to perform a limited stop, to ask the occupants to step from the vehicles and to perform a Terry frisk; and, in both stops the agents' and officers' reasonable suspicion developed into probable cause, in the course of each stop, to justify a prolonged detention and search of each vehicle.

## I.  FACTUAL BACKGROUND

The uncontested facts presented to the Court involve Mr. Camacho as a passenger in two separate vehicles, involved in two separate traffic stops, during which drugs, guns and money were found in the vehicles and on Mr. Camacho's person.

The first traffic stop occurred on 8 March 2006, and involved an action by Drug Enforcement Administration ("DEA") engaged in an extended surveillance of drug trafficking at the Micro-Tel Hotel located in Boardman, Ohio.  (Doc. 59).  DEA agents received information from a source, proven reliable in the past, that two individuals – Darbin Vargas and Ronny Espinal –  from Philadelphia, Pennsylvania had stayed at the Micro-Tel several times in the past.  The DEA agents learned from the source that these two individuals sold drugs from the same hotel room each time they stayed at the Micro-

Tel.[2] DEA agents set up surveillance on the Micro-Tel and followed three males, leaving the hotel in a tan Buick Park Avenue, to 25 10th Street, Campbell, Ohio where the agents again set up surveillance for several hours. During this time, the agents witnessed seven different vehicles arrive at the Campbell, Ohio address and depart after a very brief period. The agents were able to determine that some of the owners of the witnessed vehicles had previous encounters with law enforcement for drug trafficking and use.

The DEA agents continued to carry out surveillance of the tan Buick Park Avenue, following it as it left the 25 10th Street address. The agents observed one of the car's occupants exiting the vehicle and meeting briefly with other males on two separate occasions. After the second observed encounter, the agents lost sight of the vehicle and returned to continue their surveillance at 25 10th Street.

At approximately 7:40 p.m. the agents observed a white Ford SUV with Pennsylvania plates leave the residence. Agents followed and observed the three male occupants of the vehicle proceeding to four different locations in Youngstown, Ohio. At each location the agents witnessed the vehicle stop for approximately five minutes, individuals would approach the opened passenger window of the SUV on foot, stay briefly and then depart. At approximately 9:10 p.m., the agents determined the SUV

---

[2]The uncontested facts, represented by the government, specifically noted that DEA agents were conducting an investigation of drug trafficking at the Micro-Tel Hotel in Boardman, Ohio. The DEA agents had received complaints regarding the drug activity. The government further represented that the source of information had proven reliable in the past and was corroborated through subsequent investigation: the information was that Darbin Vargas and Ronny Espinal of Philadelphia, Pennsylvania would ask for the same room at the hotel and proceed to sell drugs from that room. (Doc. 59, pp. 1-2).

was engaging in "counter-surveillance driving tactics" and the agents decided to conduct an investigatory traffic stop.

The SUV was stopped near, or on, a bridge in the area of Wick Avenue and Route 422 in Youngstown, Ohio.  The four occupants of the vehicle included Ismael Camacho, III, Darbin Vargas, Damon Irby and Willie Quezada.  Agents approached the vehicle and removed all of the occupants, conducting a pat-down frisk on each individual.  During the frisk of Mr. Camacho an agent found a loaded 9mm magazine, a bag of marijuana and $1,727.00 in bundled currency.  The frisk of Mr. Irby yielded $7,114.00 in bundled currency, several bags of marijuana, and seven yellow pills.  All four individuals were handcuffed and placed into investigatory detention.

The agents removed the SUV to a nearby parking lot for safety reasons, as the traffic stop occurred on, or very near, a bridge.  After moving the vehicle, the officers found a .40 caliber Glock handgun in plain view lying on the rear floor of the SUV.  In response to the developments emerging from the investigatory stop the agents summoned a certified drug dog.  The drug dog arrived approximately 28 minutes later and alerted on the vehicle for the presence of narcotics.  DEA Agents then searched the vehicle and found a hidden electronic compartment located in the rear driver's side door.  The compartment yielded a loaded 9mm handgun, an empty Smith & Wesson handgun magazine, a plastic baggie containing a small amount of marijuana, and $58,570.00 in currency.

The second traffic stop in which Mr. Camacho was a passenger occurred in Tenaha, Texas on 5 May 2007.  Constable Randy Whatley and Deputy Barry Washington were on uniform patrol on U.S. Highway 59 when they observed a black

4

Lincoln Town Car traveling at 71 mph in a 55 mph zone.  Deputy Washington initiated his emergency lights and conducted a traffic stop of the Town Car.  As the two officers approached the vehicle, Constable Whatley noticed an odor of marijuana coming from the Town Car, which had both front windows and sun roof open.

The front seat passenger, Mr. Camacho, was asked if there was any marijuana in the vehicle, and he responded affirmatively.  Mr. Camacho then produced two clear plastic bags from his right front pocket which appeared to be marijuana.  The officers then removed the three occupants of the vehicle and performed a pat-down frisk for weapons.  No weapons were found.  The back seat occupant, Jerry Garcia, confirmed that he was the owner of the vehicle and consented to allow the officers to search the Town Car.

In searching the vehicle the officers noticed an alteration of the center console between the front seats that led them to believe a false compartment had been constructed beneath the console.  The officers used a device known as a "scope" which enabled them to see inside the hidden compartment where they viewed several brown packages with a clear plastic outer shell.  The officers believed the three individuals were transporting drugs and placed them under arrest, and gave them their Miranda rights.  Subsequently, the vehicle's false compartment yielded five packages testing positive for cocaine and a 9mm Smith & Wesson handgun.

In denying Mr. Camacho's suppression motion, the Court will review the facts of the instant matter and the prevailing law without the requested evidentiary hearing.  As Sixth Circuit law makes clear, "[a] district court is required to hold an evidentiary hearing when the defendant has set forth contested issues of fact that bear upon the legality of

5

the search." United States v. Thompson, 2001 WL 820905 *4 (6th Cir. 2001) (citing United States v. Black, 181 F.3d 104, 1999 WL 357759, at *3 (6th Cir. 1999) and United States v. Mejia, 69 F.3d 309, 318 (9th Cir. 1995)). In matters such as the instant case, however, the Sixth Circuit has recognized "a district court can forgo conducting an evidentiary hearing if sufficient content remains to support a finding of [a lawful search] after the contested items are set aside." Thompson, 2001 WL 820905, at *4.

## **II. LAW AND ANALYSIS**

The Fourth Amendment ensures "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. This protection extends to shield the individual from unreasonable arrests and searches by requiring the executed actions rely on probable cause. Draper v. United States, 358 U.S. 307 (1959). Our judiciary recognizes, as well established, a defendant's right to urge the suppression of evidence obtained in violation of the Fourth Amendment if the defendant demonstrates an absence of probable cause or reasonable suspicion for the search and seizure. Aldeman v. United States, 394 U.S. 165 (1969); Rakas v. Illinois, 439 U.S. 128 (1978).

The question of whether an officer has reasonable grounds to "stop" and "frisk" falls directly within the Fourth Amendment's proscription against unreasonable searches and seizures. Terry v. Ohio, 392 U.S. 1, 16 (1968). Police officers are permitted to conduct stops based on reasonable suspicion that criminal activity is afoot and to frisk the detained citizen if they have a reasonable belief the person is armed. Terry, 392 U.S. at 30. "[W]here nothing in the initial stages of the encounter serves to dispel his [or

6

her] reasonable fear for his [or her] own or others' safety, he [or she] is entitled for the protection of himself [or herself] and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him [or her]." Id.

Fourth Amendment rights are personal rights and may not be asserted vicariously.  See United States v. Myers, 102 F.3d 227, 231 (6th Cir. 1996).  The Fourth Amendment protects interests that include the "freedom of movement and insulation from the fear and anxiety produced by unlawful seizure.  In the traffic stop scenario, these interests are personal to all occupants of the vehicle that is detained."  United States v. Richardson, 385 F.3d 625, 629 (6th Cir. 2004).

To exercise the Fourth Amendment in a challenge to the legality of a search or seizure requires the defendant have standing.  See Rakas v. Illinois, 439 U.S. at 133-34.  Standing is predicated upon a reasonable expectation of privacy in the place to be searched which, in turn, hinges upon the defendant's interest and control in the searched area, the steps taken by the defendant to ensure privacy, and the broader recognition that the defendant's privacy expectations are reasonable.  Id. at 143;  See also United States v. Talley, 275 F.3d 560, 563 (6th Cir. 2001); United States v. Padin, 787 F.2d 1071, 1075-76 (6th Cir. 1986).

A passenger traveling in a stopped vehicle has standing to challenge the legitimacy of the stop, as a seizure of his or her person, yet lacks standing to challenge the search of a vehicle belonging to another or any items found on other passengers, or driver.  See United States v. Carter, 14 F.3d 1155; United States v. Decker, 19 F.3d 287, 288 (6th Cir. 1994).

7

**A.     The 8 March 2006 Traffic Stop in Youngstown, Ohio**

Pursuant to Terry v. Ohio, 392 U.S. 1 (1968), the police may carry out an investigative stop based upon reasonable suspicion the individual is engaged in criminal activity.  Courts have enunciated the posture of that power to perform an investigative stop as "brief" to determine "identity or to maintain the status quo momentarily while obtaining more information." Adams v. Williams, 407 U.S. 143, 145-46 (1972).  Courts have recognized that officers "may ask the detainee a moderate number of questions to determine his [or her] identity and to try to obtain information confirming or dispelling the officer's suspicions."  Berkemer v. McCarty, 468 U.S. 420, 439 (1984).

The Court expounded on Terry in United States v. Cortez, 449 U.S. 411, 417-418 (1981), stating,

> [a]n investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity ... the totality of the circumstances--the whole picture--must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.

Courts have long held that a law enforcement officer lacking probable cause sufficient to justify an arrest may briefly detain an individual for investigative purposes without violating the Fourth Amendment if the officer possesses a "reasonable suspicion that [the defendant] was engaged in wrongdoing when [the officer] encountered him." U.S. v. Sokolow, 490 U.S. 1, 7 (1989).  See also  United States v. Lopez-Arias, 344 F.3d 623, 627 (6th Cir. 2003) (holding that "courts have recognized that a law enforcement officer who lacks probable cause to justify an arrest may nevertheless

8

briefly detain an individual without violating the Fourth Amendment if the officer possesses a reasonable and articulable suspicion that the individual has committed a crime").  A finding of reasonable suspicion may "arise from information that is less reliable than that required to show probable cause."  Alabama v. White, 496 U.S. 325, 330 (1990).

The totality of the circumstances surrounding the actions of the occupants of the Ford SUV under surveillance on the evening of 8 March 2006 provided the agents with the reasonable suspicion necessary to justify an investigatory stop of the vehicle in which Mr. Camacho was a passenger.  The experienced DEA agents carried themselves along a trail of surveillance, predicated on reliable information, from the Micro-Tel Hotel to the residence at 25 10th Street, Campbell, Ohio, and then to the Ford SUV itself with Pennsylvania plates in which Mr. Camacho was riding.  The information provided to the agents, the surveillance of the activity at the residence, along with the DEA agents' observations of the multiple, brief encounters made by other persons with the occupants of the Ford SUV, provided an objectively reasonable and articulable suspicion that the occupants of the SUV were engaging in drug trafficking behavior.

The DEA agents were well within the purview of the Fourth Amendment in requesting that Mr. Camacho, along with the other vehicle passengers, exit the Ford SUV.  Pennsylvania v. Mimms, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) stands for the proposition that without any showing the particular suspect may be armed, an officer may require a person lawfully stopped to step from a vehicle in order to diminish "the possibility, otherwise substantial, that the driver can make unobserved movements."  Id.   The Mimms rule is equally applicable to passengers such as Mr.

9

Camacho pursuant to Maryland v. Wilson, 519 U.S. 408, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997).  Both Mimms and Wilson recognize the minimal added intrusion of a request to exit a vehicle as justified in the interest of an officer's safety.

To have an adequate foundation for the limited search performed on Mr. Camacho, the agents "must have constitutionally adequate, reasonable grounds for doing so." Sibron v. New York, 392 U.S. 40, 64 (1968). "[The agent] must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous." Id.  When assessing these particular facts, courts are to consider the totality of the circumstances, recognizing "that roadside encounters between police and suspects are especially hazardous." Michigan v. Long, 463 U.S. 1032, 1049 (1983).

Determining whether an officer's protective search was reasonable for purposes of the Fourth Amendment involves two inquiries.  First, the Court must decide whether the search was justified at its inception.  Second, the Court must determine if the search was reasonably related in scope to its protective purpose.  See Terry, at 19-20, 88 S.Ct. 1868.

To initiate a protective search, an officer need not be absolutely certain that a suspect is armed. Rather, the inquiry focuses on "whether a reasonably prudent man [or woman] in the circumstances would be warranted in the belief that his [or her] safety or that of others was in danger." Id. at 20, 88 S.Ct. 1868.  In Adams v. Williams, 407 U.S., at 146, the Court made explicit what was implicit in Terry:

> "A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time."

10

Here, the Court finds that the DEA agents had a reasonable basis for concluding their safety was in danger. Given the totality of circumstance, the Court finds the agents possessed the facts from which they could reasonably infer the occupants of the Ford SUV might be armed and dangerous.[3] The agents observed activity from which they could reasonably suspect drug trafficking and the reasonable inference that guns might be an issue in the investigation.

Next, the Court must determine whether the DEA agents were justified in the scope of the search in which they engaged. The protective search endorsed in Terry, as in this instance, involved a pat-down of a suspect's outer clothing. That limited search was found constitutionally firm. In this instance, Mr. Camacho could have gained immediate access to a weapon carried in the outer layers of his clothing; a limited pat-down search might reveal the existence of such a weapon. Accordingly, the agents' substantially proscribed search of Mr. Camacho's person was a constitutionally sufficient protective search under Terry. The evidence recovered from Mr. Camacho's person is therefore admissible.

---

[3] Requiring Mr. Camacho, and other occupants, to exit the vehicle and submit to a limited pat down search of his person as a means of evaluating the officers' suspicion was a reasonable response to that suspicion and within the ambit of what is allowed by Terry and Fourth Amendment jurisprudence. It is certainly the case that while individual factors might not be sufficient, a collection of individually insufficient factors can give the police justification to frisk a detainee: "In reviewing the reasonableness of a Terry stop, a court must consider all of the relevant circumstances, which 'are not to be dissected and viewed singly'; rather they must be considered as a whole." United States v. Gilliard, 847 F.2d 21, 24 (1st Cir. 1988) (quoting United States v. Trullo, 809 F.2d 108, 111 (1st Cir. 1987)). Recognizing that officers make on-the-spot decisions in dangerous situations, the analysis is one of reasonable belief, not whether the officers were certain or ultimately correct about whether there was a threat.

11

During the investigatory stop of the vehicle, and the Terry frisk of the occupants, the DEA agents' reasonable suspicion ripened into probable cause to search the Ford SUV when the officers found one passenger in possession of various bags of marijuana and approximately $7,100.00 in bundled currency, while Mr. Camacho was found in possession of marijuana, a loaded 9mm magazine, and approximately $1,700.00 in bundled currency.  See United States v. Perez, 440 F.3d 363, 370 (6th Cir. 2006) (finding that once the purpose of a traffic stop is completed, a police officer "may not 'further detain the vehicle or its occupants unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention.'")

Probable cause to search the vehicle was further substantiated when the DEA agents found a .40 caliber Glock handgun in plain view on the floor of the SUV after the agents made the reasonable decision to move the vehicle to a nearby parking lot, from the bridge upon which it had been stopped.[4]  Florida v. Royer, 460 U.S. 491, 505 (1983);  United States v Greene, 783 F.2d 1364, 1367 (9th Cir.), cert denied, 476 U.S. 1185 (1986) (finding that facts emerging after the investigatory stop may cause the former reasonable suspicion to ripen into probable cause for arrest).

---

[4]Short of probable cause, pursuant to Michigan v. Long, 463 U.S. 1032 (1983) and United States v. Graham, 483 F.3d 431, 440 (6th Cir. 2007), the officers possessed reasonable suspicion to empower a limited search of the vehicle as an extension of the rationale in Terry.  That reasonable suspicion emerged from the discovery of the loaded 9mm magazine in Mr. Camacho's pocket, from which the agents could reasonably assume that a handgun may be present in the vehicle.  The Sixth Circuit enables such limited searches to ensure officer safety.

Finally, probable cause to search the vehicle was bolstered when the DEA agents summoned a drug dog which, upon arrival, performed an exterior narcotic sniff and alerted on the vehicle for the presence of narcotics.  See United States v. Perez, 440 F.3d at 374 (holding that probable cause to justify a warrantless search of a vehicle exists once a "properly trained and reliable drug detection dog" provides a positive alert to the presence of narcotics in the vehicle).

The Court will not grant a suppression of the evidence found on Mr. Camacho's person.  The marijuana, the loaded 9mm magazine, and the approximately $1,700.00 in bundled cash found on Mr. Camacho emerged from a Terry frisk supported by reasonable suspicion both of illegal drug activity and for the agents' safety.  Further, the search of the vehicle, supported by probable cause, yielded a .40 caliber Glock and, within a hidden electronic compartment located a loaded 9mm handgun, an empty Smith & Wesson handgun magazine, a plastic baggie containing a small amount of marijuana, and $58,570.00 in currency.  Pursuant to the decision in United States v. Carter, 14 F.3d 1150, 1154 (6th Cir. 1994), Mr. Camacho lacks standing to challenge the search and seizure of the evidence in the vehicle.  Mr. Camacho has the burden of asserting an expectation of privacy in the vehicle's hidden compartment,  Rakas v. Illinois, 439 U.S. 128, 133-34 (1978), yet he makes no such showing.

### B. The 5 May 2007 Traffic Stop in Tenaha, Texas

The traffic stop on 5 May 2007 in Tenaha, Texas, again involved Mr. Camacho as a passenger in a vehicle.  Mr. Camacho seeks to suppress the five packages of

13

cocaine and the 9mm Smith & Wesson handgun officers found in the vehicle's false compartment in the center console between the front seats of the Lincoln Town Car.

Pursuant to the decision in United States v. Carter, 14 F.3d at 1154, Mr. Camacho lacks standing to challenge the search and seizure of the evidence in the vehicle where he does not, as he does not here, assert an expectation of privacy in the contents of the vehicle. Mr. Camacho may, however, pursuant to United States v. Carter, challenge the legitimacy of the stop because the stop results in the temporary seizure of all occupants of the vehicle. Id; see also United States v. Brignoni-Ponce, 422 U.S. 873, 878 (1975).

The Lincoln Town Car's rate of travel, at 71 mph in a 55 mph zone, clearly violated Texas traffic laws warranting an initial stop by the officers to further investigate the violation and determine whether they should make an arrest, or issue a citation, or warning. See New York v. Belton, 453 U.S. 454, 455 (1981). The uncontested evidence indicates Constable Whatley, in approaching the vehicle, which had its windows down and sun roof open, detected the odor of marijuana originating from the vehicle. Mr. Camacho, sitting in the front passenger seat, was asked if there was any marijuana in the vehicle. The defendant answered in the affirmative and, from his right front pants pocket, he produced two clear plastic baggies of, what the officers reasonably assumed, was marijuana. See United States v. Garrido-Santana, 360 F.3d 565 (6th Cir.), cert. denied, 542 U.S. 945 (6th Cir. 2004) (finding it permissible to ask a defendant about the presence of drugs during a stop for speeding where the questioning did not unreasonably prolong the stop). The officers removed the driver and two passengers and performed a Terry frisk for weapons. See Pennsylvania v.

Mimms, 434 U.S. at 111. The back seat passenger admitted ownership of the vehicle and gave the officers consent to search the vehicle in which was found five packages of cocaine and a 9mm Smith & Wesson handgun in a hidden compartment. See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) (establishing that a warrantless search by law enforcement officials will be upheld if a detainee has voluntarily consented to the search). Mr. Camacho has not challenged the voluntariness of the vehicle owners consent to allow his Lincoln Town Car to be searched.

The Sixth Circuit has consistently held that an officer's detection of the odor of marijuana coming from inside a vehicle during a reasonable stop provides probable cause to search the vehicle. See United States v. Foster, 376 F.3d 577, 588 (6th Cir. 2004) (holding that the officer's detection of the odor of marijuana issuing from the defendant's vehicle establishes probable cause to search the vehicle without a warrant); United States v. Garza, 10 F.3d 1241, 1246 (6th cir. 1993) (finding that the smell of marijuana created probable cause to believe there was marijuana in the vehicle); United States v. Jackson, 63 Appx 839, 842 (6th Cir. 2003).

The officers lawfully stopped the speeding vehicle in which Mr. Camacho was a passenger and possessed the requisite probable cause to search the vehicle. Accordingly, Mr. Camacho's challenge of the legitimacy of the vehicle stop fails and he has no standing to challenge the evidence found in the search of the vehicle over which he, as a passenger, has asserted no expectation of privacy.

## III. CONCLUSION

15

For the reasons discussed above, this Court denies Mr. Camacho's motion to suppress the evidence seized pursuant to a search of his person and of the vehicles in which he was a passenger.  The Court further denies Mr. Camacho's motion to suppress all statements he made during, and subsequent to, the two searches.

IT IS SO ORDERED.

   /s/Lesley Wells  
UNITED STATES DISTRICT JUDGE